IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT LEXINGTON

| | | |
|---|---|---|
| SHURWEST, LLC,<br>    Plaintiff,<br><br>vs.<br><br>CAROLYN HOWARD,<br>    Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO._____ |

### PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Shurwest, LLC ("Shurwest") files this original complaint against Defendant Carolyn Howard ("Howard") and respectfully states:

### I.  Summary

1. This is a declaratory judgment action. Howard is a high-net-worth retirement planner who made a fully informed decision to invest in what turned out to be an apparent fraudulent scam. She also recommended that her clients invest in the scam. Now, faced with the inability to recover losses from the company she and her clients invested in, she is baselessly blaming Shurwest for her unfortunate decisions. Shurwest seeks a declaration that it owed no duty to protect Howard from herself, that Shurwest was not involved in Howard's decisions to invest in – or recommend that others invest in – a scam, and that Shurwest is not responsible for the claimed losses of Howard or her clients.

### II.  Parties

2. Shurwest is an Arizona limited liability company whose members are all citizens of states other than Kentucky.

3. Howard is an individual resident of Kentucky. She may be served at 219 E. High Street, Lexington, KY 40507 or wherever she may be found.

1

### III.  Jurisdiction and Venue

4.      The Court has jurisdiction over Howard because she is a resident of the State of Kentucky.  The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.      Venue is proper in this district because Howard resides in this district.  28 U.S.C. § 1391(b)(1).

### IV.  Factual Background

6.      Shurwest is an industry-leading independent marketing organization ("IMO").  It markets annuities and insurance products to retirement planners, who are licensed insurance agents.  As one court explained the relationship of IMOs and retirement planners:

> Insurance companies generally do not recruit independent insurance agents to sell their products. Instead, IMOs recruit independent insurance agents to sell [fixed index annuities] and other types of insurance products to the independent agents' clients. An IMO serves as a third-party intermediary between the agents and the insurance companies, providing product education, marketing, and distribution services. Insurance companies generally compensate IMOs for their support services based on a percentage of agent sales volume.

*Mkt. Synergy Group, Inc. v. United States Dep't of Labor*, 16-CV-4083-DDC-KGS, 2016 WL 6948061, at *3 (D. Kan. Nov. 28, 2016).

7.      Howard is a retirement planner and insurance agent licensed in the states of Florida and Kentucky.  She touts herself as a "certified financial planner knowledgeable in a wide range of financial matters."  On her website, she invites investors to "Get to know your partner in your financial plan."

8.      Importantly, Howard also holds Series 63 (securities agent) and Series 65 (investment advisor) licenses.  As a registered investment adviser, Howard owed her clients a

fiduciary duty of "utmost good faith, and full and fair disclosure of all material facts, as well as an affirmative obligation to avoid misleading clients." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194 (1963); *see also Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 472 n.11 (1977) (finding that *Capital Gains* established a federal fiduciary standard for investment advisers). Howard also owed her clients a duty to act in their "best interest." *See, e.g.*, *SEC v. Tambone*, 550 F.3d 106, 146 (1st Cir. 2008) (imposing "a fiduciary duty on investment advisers to act at all times in the best interest of the fund and its investors"). As a result, she could only benefit from her clients' investments if her benefit and all related details of the transaction are disclosed. *See Capital Gains*, 375 U.S. at 191-92.

9. On December 13, 2016, Howard signed paperwork to engage Shurwest's IMO services. On February 10, 2017, Howard signed a broker sales contract with Minnesota Life Insurance Company ("Minn Life"). Pursuant to that agreement, Howard acted as broker for Minn Life and sold its products to her clients. As IMO, Shurwest provided education, marketing, and distribution services to both Minn Life and Howard. When Howard sold a Minn Life product, Minn Life paid commissions to Shurwest and Howard. All of that is completely normal, and not what this lawsuit is about.

10. This lawsuit is about Future Income Payments, LLC ("FIP").[1] FIP bought pensions, disability payments, and other revenue streams from veterans, retirees, and other groups. It then sold those revenue streams to investors – people like Howard and Howard's clients – who used the cash flow to fund ongoing investments.[2]

---

[1] FIP appears to have operated through a tangled web of entities, affiliates and related businesses. This complaint refers to FIP's overall fraudulent organization, without regard to which instrumentality of it was used to perpetrate the fraud.

[2] Such as, for example, the ongoing premium obligations on indexed universal life policies issued by Minn Life.

11. According to news reports, FIP preyed on the most vulnerable populations among us, often charging usurious interest rates in the triple digits. For example, FIP might buy a stream of 24 monthly disability payments of $500 each (or $12,000) for $3,000, or even less. FIP would then sell that stream of payments to an investor for $11,000, touting that it was achieving a return for the investor of better than 9%. Meanwhile, FIP reaped a significant windfall at the detriment of the disabled person. For those reasons, when Shurwest employee Melanie Schulze-Miller ("Schulze-Miller") requested approval from Shurwest management in April of 2016 to market FIP product to agents (like Howard), the answer was an unequivocal "no."

12. Undeterred and apparently greedy for the commissions FIP was promising, Schulze-Miller decided to create and operate a separate business – MJSM Financial LLC ("MJSM") – through which she would market FIP products to agents and advisers. She established MJSM email accounts and operated MJSM as a side business, undisclosed to Shurwest. She brought another Shurwest employee, Nick Johnson, into the MJSM fold so that he, too, could market FIP products.

13. Johnson was Howard's contact at both Shurwest (for legitimate products) and MSJM (for FIP products). On February 10, 2017, Johnson emailed Howard a flier touting FIP's "structured notes." On February 21, 2017, Howard emailed Schulze-Miller a copy of an agreement between Howard and FIP pursuant to which Howard would market FIP products. Just as Shurwest was the IMO in the relationship between Minn Life and Howard, MJSM was the IMO in the relationship between FIP and Howard. In other words, MJSM would receive fees from FIP when Howard sold an FIP product. Upon information and belief, FIP would also send commissions on to Howard. Shurwest did not receive any compensation from, or in any way related to, FIP.

14. On April 13, 2017, Howard forwarded Johnson an email from one of her retirement planning clients – Lee Anne Walmsley ("Walmsley") – which instructed Howard to "please purchase 3 year structured notes," a reference to FIP products. It seems that shortly thereafter, Howard – through MJSM – purchased FIP products on Walmsley's behalf. Howard told MJSM that Walmsley "has plenty of other money." Howard earned a commission from FIP on Walmsley's purchase of FIP products. Shurwest, of course, did not.

15. Neither Howard nor Walmsley can seriously argue that Shurwest was involved with Walmsley's investment. On March 2, 2017 – prior to Walmsley's purchases – Johnson sent her an email from his MJSM email address providing "information for you so that you can do some due diligence." That email contained the following bold and italicized type: "***Structured Cash Flow products are offered through Future Income Payments. Shurwest Financial Group does not represent nor is affiliated with Future Income Payments. All business transactions should go directly to Future Income Payments.***" Any claim against Shurwest – by either Howard or Walmsley – necessarily ignores (1) that Howard (not Shurwest) had the due diligence obligation; and (2) that the investments Walmsley bought were offered through FIP, not Shurwest.

16. On April 18, 2017, Howard bought FIP products for herself. Howard signed a purchase agreement with FIP in which she made a host of representations that wholly negate any claim against Shurwest:

> I confirm that I understand the purchase of a future income payment based on the sale of a pension cash flow is only suitable for persons who have adequate financial means without the Purchase Price for the [FIP] Asset, who desire a relatively long-term asset and who will not need immediate liquidity from this asset.
>
> and
>
> I confirm I understand that, while FIP will take [but unidentified] certain steps in order to protect my rights to the [FIP]Asset, there are events out of FIP's control which could result in my not receiving all payments purchased in a future income

> payment purchase transaction, and that FIP cannot and does not guarantee that I will receive all such payments.
>
> and
>
> I acknowledge that FIP is not providing, and does not provide, any legal, tax, financial or other advice of any nature and recommends that the IRA Owner and Purchaser consult their own professional advisor(s) prior to entering into a transaction for the purchase of a future income stream.

17. She also represented that:

> Purchaser [Howard] has determined, based on his or her own independent review and such professional advice as he or she has deemed appropriate under the circumstances, that the acquisition of the [FIP product]: (i) is fully consistent with his or her financial needs, and (ii) is fit, proper, and suitable, notwithstanding the risks inherent in purchasing the [FIP product.]
>
> and
>
> Purchaser is sufficiently sophisticated, knowledgeable and experienced in financial and business matters as to be capable of determining and evaluating the merits and risks of purchasing the [FIP product] and to be capable of protecting the Purchaser's interest in connection with such purchase.
>
> and
>
> There are multiple risks associated with the purchase of the [FIP] Asset. These risks include, but are not limited to [ten specific risks] listed below. By initialing next to each risk listed below, the IRA Owner acknowledges and agrees that he or she has read, fully understands and accepts the risks of purchasing the [FIP] Asset.

Perhaps most telling is FIP's disclosure that "U.S. federal law currently prohibits the assignment or alienation of pension payments for both military and non-military pensions."[3] In other words, the FIP product was – and is – illegal. Nobody in their right mind would subscribe to an illegal investment. But that is exactly what Howard did. On information and belief, Walmsley executed an FIP contract with identical representations and disclosures.

---

[3] A true and correct copy of the FIP contract document is attached as Exhibit A.

6

18. After signing the FIP contract, Howard put up more than $600,000 to buy FIP products. Among her purchases were six five-year streams of veterans' benefits. On information and belief, she received a commission on her own investment. Shurwest, again, did not.

19. Apparently unbeknownst to Howard at the time, FIP had already begun unraveling. Multiple state regulators had sued FIP, and even more were investigating it. By early 2019, the game was over. In March, a grand jury indicted FIP and its founder. By April of 2019, FIP was in a court-ordered receivership.

20. All of this came as a shock to exactly nobody, save people who wanted to reap excessive commissions (Howard) and people who wanted to take advantage of veterans, the disabled, and the elderly for their own financial benefit (Walsmley and Howard).

21. Howard, Walmsley and all the other agents and investors who lost money with FIP are, perhaps unsurprisingly, now looking for some way to recoup their losses. Walmsley sued Howard, alleging that Howard should not have directed Walsmley toward FIP.

22. The problem is that Howard, now suffering the consequences of her greed – both in the form of a lawsuit and her own lost investment principal – then sent a demand letter to Shurwest. In it, she baselessly complains that Shurwest recommended that she participate in the FIP scam, causing her to lose more than half a million dollars. That is nonsense; as Schulze-Miller told Howard before Howard invested, "Shurwest doesn't wholesale FIP." Schulze-Miller was blunt: "Your contract is direct[ly] from [FIP.]" Howard clearly understood that: she asked "what my license # is with [FIP]." In any event, the notion that an experienced financial planner would drop that much money into an investment just because somebody—whether Shurwest or not—told her it was a good idea is absurd. Howard is understandably upset that she ruined the lives of her

clients and wrecked her own savings. Blaming her actions on Shurwest, however, is not understandable.

23. Shurwest never recommended FIP products, it never marketed FIP products, and it was never paid a cent in commission from the sale of FIP products. Howard and Walmsley are in a predicament that they, with the help of MJSM, created for themselves. This lawsuit seeks a declaration making that clear.

## V.  Request for Declaratory Judgment

24. The Declaratory Judgment Act provides that "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Courts have broad discretion in exercising jurisdiction and fashioning relief. *Wilton v. Seven Falls Co.,* 515 U.S. 277, 286 (1995); *Aetna Cas. & Sur. Co. v. Sunshine Corp.,* 74 F.3d 685, 687 (6th Cir. 1996).

25. In determining the scope of appropriate relief, courts consider the following factors: (1) whether the declaratory action would settle the controversy; (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue; (3) whether the declaratory remedy is being used merely for the purpose of procedural fencing or to provide an arena for a race for res judicata; (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach on state jurisdiction; and (5) whether there is an alternative remedy which is better or more effective. *Aetna,* 74 F.3d at 687. All of these factors strongly weigh in favor of entering a declaratory judgment resolving this controversy.

26. The declaratory judgment sought would settle the controversy between Howard and Shurwest in that it would clarify the legal relations at issue. Specifically, Shurwest seeks a

declaration that as it relates to investments in the FIP scheme, Shurwest had no legal relationship at all. At most, Shurwest was involved in an arms-length transaction with respect to *other* products; it assumed no duty of care or other duty to Howard or Walmsley with respect to FIP. Under Kentucky law, such duties "rarely arises in commercial relationships." *See Guangzhou Consortium Display Prod. Co. v. PNC Bank, Nat. Ass'n*, 956 F. Supp. 2d 769, 780 (E.D. Ky. 2013) (citations omitted). "This is because in an arms-length commercial transaction, each party is assumed to be protecting its own interest." *Id*. at 781 (citations and quotations omitted).

27. There are no concerns of procedural fencing or increased friction between federal and state courts, and there is no remedy that is better or more effective. As a result, the Court should enter the requested declaration.

## VI. Prayer

28. Shurwest respectfully requests that Howard be summoned to answer and appear herein, and that the Court – upon final trial or hearing – declare that Shurwest owed no duty relating to FIP or any investment in FIP, and that Shurwest is not responsible for any loss at the hands of FIP.

Respectfully submitted,

*/s/ Jason T. Ams*
Jason T. Ams (Bar No. 91886)
Lauren R. Nichols (Bar No. 94370)
Bingham Greenebaum Doll LLP
300 W. Vine Street, Ste. 1200
Lexington, KY 40507
Tel:   (859) 231-8500
Fax:   (859) 255-2742