UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| SHURWEST, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | No. 5:19-CV-180-REW |
| | ) | |
| v. | ) | |
| | ) | OPINION & ORDER |
| CAROLYN HOWARD, | ) | |
| | ) | |
| Defendant. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

"Away, you mouldy rogue, away!"[1]

Plaintiff Shurwest, LLC is a self-described "industry-leading independent marketing organization" that markets the financial products of other companies to retirement planners. In 2017, its National Sales Director of Life Insurance (Melanie Schulze-Miller) marketed certain structured notes to Carolyn Howard, a Kentucky financial planner. The Director did this during a visit by Howard to Shurwest headquarters in Arizona, a cross-country business-recruiting trip paid for in full by Shurwest. Howard took the bait on the structured notes (for herself and one of her clients). Disaster (and loss) ensued when the structured notes seller imploded in a series of criminal and regulatory enforcement actions, actions that swept up Shurwest's National Sales Director as well. Shurwest and Howard are before the Court on a series of theories to sort out Shurwest's responsibilities, if any, for Howard's damages.

---

[1] An immortal insult from character Doll Tearsheet. William Shakespeare, *Henry IV Part 2*, act 2, sc. 4, l. 126.

It's clear enough that Schulze-Miller "went rogue" in marketing the structured notes at Shurwest. The Company had rejected her proposal to market the structured notes in 2016.  She made an end-run by creating a secret, side company, furtively enlisting some Shurwest employees, and forging on in the shadows. Adopting Doll's posture from the Shakespeare quote, Shurwest loudly distances itself from Schulze-Miller and contends that her rogue status provides a tidy way to end the dispute, now centering on cross-motions for summary judgment. Shurwest disavows any involvement in the marketing of the notes and any obligation for the conduct of its National Sales Director or her complicit underlings.

The Court has assessed the full record and the briefing.[2] Ultimately, under the Rule 56 standards, the record is far less categorical and far more nuanced than Shurwest contends. In the Court's view, there are genuine disputes of material fact that preclude judgment for either party. That Schulze-Miller broke faith with Shurwest is not the end of the query. At the core, a jury must decide whether, in dealing with client Howard, Schulze-Miller yet acted within the scope of her Shurwest employment or whether she otherwise acted with apparent authority from the Company. Because the liability theories (put forth by counterclaim) are otherwise largely submissible, the jury also must evaluate the causes of action that hinge on Schulze-Miller's behavior. There will be plenty of opportunity for the jury to consider Howard's own role and responsibility, but whatever comparative fault

---

[2] Various motions pend in this matter. *See* DE 55 (Shurwest's Partial Summary Judgment Motion), DE 85 (Howard's Motion for Judicial Notice), DE 93 (Howard's Motion for Leave to File Reply Instanter re: DE 85), DE 94 (Howard's Motion for Summary Judgment), DE 98 (Howard's Objection to Judge Atkins' discovery decision (DE 92)), DE 99 (Shurwest's Motion to Exclude Expert Testimony of Peter Kennedy), DE 100 (Shurwest's Motion for Summary Judgment on Howard's Counterclaims), & DE 101 (Shurwest's Motion for Leave to Seal Document relating to DE 100). All are briefed.

she may bear is not the subject of summary judgment. The Court **DENIES** all pending dispositive motions and resolves the other matters as this decision reflects.

## I.     Background

The Court derives the factual background from the record. Although there is sharp dispute over what the facts signify, there are few contests at this stage on what historically happened. The Court here simply maps the assertions, making no factual findings in this procedural step, using the prism and/or making the reasonable inferences, relative to the particular movant or non-movant, that Rule 56 requires.

Shurwest is an independent marketing organization (IMO). DE 1 at 2 (Complaint ¶ 6). Shurwest markets annuities and insurance products to retirement planners, who are licensed insurance agents. *Id.* Carolyn Howard (Howard) is a licensed insurance agent and certified financial planner. DE 10 at 14 (Counterclaim ¶ 16). Howard holds Series 63 (securities agent) and Series 65 (investment advisor) licenses. DE 1 at 2 (Complaint ¶ 8). Future Income Payments, LLC (FIP) was an organization that purchased pensions, disability payments, and other revenue streams from individuals and then sold those revenue streams to investors. *Id.* at 3 (Complaint ¶ 10). Melanie Schulze-Miller was an employee of Shurwest from June 2012 to May 2018. DE 45-2 at 2 (Schulze-Miller Decl. ¶ 3). At all relevant times, she was National Sales Director of Life Insurance. In early 2016, Schulze-Miller sought approval from Shurwest management to market FIP products; Shurwest rejected the request. *Id.* (Schulze-Miller Decl. ¶¶ 4–5). On May 3, 2016, Schulze-Miller formed MJSM Financial LLC (MJSM), a limited liability company, owned wholly by Schulze-Miller, to refer FIP products. *Id.* at 2–3 (Schulze-Miller Decl. ¶¶ 6–7). Schulze-Miller did not disclose this business to Shurwest. *Id.* at 3 (Schulze-Miller Decl. ¶ 7).

In early February 2017, Howard flew to Arizona and attended a day-long event hosted, paid for, and fully sponsored by Shurwest, at Shurwest's corporate headquarters. DE 111-1 at 2–3 (Howard Decl. ¶¶ 3–5). Howard met, over the course of the day, with several Shurwest employees, including Schulze-Miller. *Id.* During their meeting, Schulze-Miller introduced and explained FIP products to Howard. *Id.* at 3–4. Schulze-Miller specifically included FIP structured notes as part of a strategy (the "IRA Reboot") that included the purchase of insurance products via the purchased income stream. The pitch, according to Howard, included specific statements vouching for FIP's reliability, legitimacy, and risk status. Schulze-Miller specifically stated that Shurwest used FIP products with many clients and had vetted FIP.  *See id.* at 3–4 (Howard Decl. ¶¶ 5–8).

Schulze-Miller provided Howard an FIP marketing contract. On February 21, 2017, Howard emailed Schulze-Miller the Future Income Payments, LLC Producer Marketing Agreement, signed by Howard. *Id.*1 at 4 (Howard Decl. ¶ 8); *id.* at 26–33 (FIP Agreement). That contract listed Shurwest, on line 1, as the "referral/marketing group." *Id.* at 27. Schulze-Miller received the signed agreement on her Shurwest email account and promised, in reply, to complete the contracting status for Howard at FIP.  *Id.* at 25.

In addition to Schulze-Miller, Shurwest employees Nick Johnson and Michael Seabolt also made representations to or dealt with Howard regarding FIP. *Id.* at 5 (Howard Decl. ¶ 15). They often communicated about specific investments via their Shurwest email accounts. Indeed, per Howard, Johnson reported to Howard, via his Shurwest account, that he had transmitted Howard's producer packet to FIP.  *Id.* at 4 (Howard Decl. ¶ 9).  Some of the transmittals involving Schulze-Miller and Johnson came from the email domain of MJSM, Schulze-Miller's secret entity.

Soon after, Howard also contracted through Shurwest to become a broker via Minnesota Life Insurance Company (Minn. Life). This contract dovetailed with the IRA Reboot strategy Schulze-Miller had discussed with Howard. *See id.* at 4–5 (Howard Decl. ¶¶ 11 & 15). Howard purchased structured notes, and then a Minn. Life insurance policy, as part of her own investment and part of what she understood to be the IRA Reboot strategy touted by Schulze-Miller. *See id.* at 5–6 (Howard Decl. ¶ 15 & 18).

Howard invested $500,000 of her own money in FIP products and recommended FIP structured notes to her client Lee Anne Walmsley, who then purchased two notes, totaling $225,000. *Id.* (Howard Decl. ¶¶15–16); DE 10 at 17 (Counterclaim ¶ 28). In April 2018, FIP's President Scott Kohn announced that FIP had ceased the majority of its operations and would no longer make payments to investors due to ongoing regulatory actions and litigation. DE 10 at 16 (Counterclaim ¶ 25). In early 2019, FIP and its founder were indicted, and FIP entered a court-ordered receivership. DE 1 at 7 (Complaint ¶ 19). Due to the collapse of FIP, Howard and Walmsley, like other FIP investors, lost their investments. Shurwest promptly fired Schulze-Miller when her activities came fully to light.

The record, without contest or contradiction, supports several conclusions. Schulze-Miller marketed FIP products without the permission of Shurwest, which had rejected her proposal to refer advisors to FIP as a funding mechanism for life insurance policies. Schulze-Miller did not inform Shurwest of her FIP linkage, her formation of MJSM, or her marketing of FIP via Shurwest's facilities or other resources. Shurwest was not a party to any FIP contract and did not derive funds from FIP itself—any commissions on FIP products went to Schulze-Miller or MJSM. DE 45-2 at 2–3 (Schulze-Miller Decl. ¶¶ 4–

5

10).    Shurwest did, however, receive commissions from Howard's purchase of a life insurance policy[3] through Minn. Life, which Howard funded that through the FIP income stream. *See* DE 96 (Commissions Spreadsheet); DE 1 at 3 n. 2 (referencing Howard using cash flow from FIP notes to fund ongoing investments, including use of income stream for "ongoing premium obligations on indexed universal life policies issued by Minn Life"). In Howard's case, per the record, (and presumably for others involved in the IRA Reboot), if the mechanism involving structured notes led to purchase of a life policy, Shurwest got a resulting commission benefit.

Shurwest seeks a declaration that it had no duty, was not involved, and has no responsibility for the FIP debacle. Though Shurwest nominally is Plaintiff, Howard is the one actually making affirmative claims for relief, through a series of Kentucky-law tort and statutory claims. Each side seeks dispositive relief, but a jury must sort this complicated relationship and determine whether Schulze-Miller's rogue acts were actionable and ones Shurwest yet should have liability for.

## II.    Shurwest's Motion to Exclude

First, to clarify the decisional record, the Court addresses Shurwest's motion targeting Howard's expert. Shurwest moves to exclude the testimony of Peter Kennedy, who Howard has offered as an expert. DE 99 at 1. Federal Rule of Evidence 702 provides that a qualified expert witness may testify if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the

---

[3] Policy or policies—the number is unclear.

principles and methods to the facts of the case." From Rule 702, the Sixth Circuit has distilled three requirements for an expert's opinion to be admissible. "First, the witness must be qualified by knowledge, skill, experience, training, or education. Second, the testimony must be relevant, meaning that it will assist the trier of fact to understand the evidence or to determine a fact in issue. Third, the testimony must be reliable." *In re Scrap Metal Antitrust Litigation*, 527 F.3d 517, 529 (6th Cir. 2006) (internal quotation marks and citations omitted). "A district court must perform a 'gatekeeping role' to ensure that the testimony meets those mandates." *Madej v. Maiden*, 951 F.3d 364, 369 (6th Cir. 2020) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 113 S. Ct. 2786, 2798 (1993)).

Shurwest argues that the Court should exclude Kennedy because (1) Kennedy is not qualified to testify regarding the standard of care applicable to IMOs, (2) Kennedy's opinions are not reliable, (3) Kennedy's opinions are irrelevant, and (4) Kennedy's report puts forth improper legal conclusions. DE 99. The matter is fully briefed. The Court agrees with Shurwest, in part.

First, Shurwest argues that Kennedy is not qualified to provide an opinion in this matter because he does not purport to have specific experience relating to IMOs. DE 99 at 4–5. Howard argues that it is not a Rule 702 requirement for Kennedy to have granular experience with IMOs, and that Kennedy's "experience related to insurance/annuity products and insurance and investment advisory firms" demonstrates that he has the requisite knowledge to provide sound opinions pertinent to Shurwest's standard of care as an IMO and the relationships in this case. DE 106 at 6. The qualification requirement is "treated liberally," however, that "does not mean that a witness is an expert simply because he claims to be." *Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000) (citation omitted).

Kennedy has "over thirty years of broad advisory expertise in legal, regulatory compliance, supervisory program design, administration and operations." DE 99-3 at 12. According to Kennedy, he is "familiar with insurance industry products, as well as customs and practices of the insurance industry that relate to the issue in this situation" and has "lengthy experience in the financial services industry which markets and sells investment products." DE 106-1 at 2–3 (Kennedy Decl. ¶ 3). While he does not have specific experience with IMOs, it is apparent that Kennedy has extensive knowledge (from multiple vantage points and over decades) of the industry in which Shurwest operates and the types of investment products it markets. In light of his relevant experience and the liberal qualification standard, Kennedy is qualified to provide certain opinions. Shurwest can cross-examine Kennedy on his particular background; that, here, is a weight matter.

Second, Shurwest argues that Kennedy's opinions are unreliable because they are not based on sufficient facts and because there is an analytical gap between the facts and Kennedy's opinions. DE 99 at 5–10. "Rule 702 guides the trial court by providing general standards to assess reliability: whether the testimony is based upon 'sufficient facts or data,' whether the testimony is the 'product of reliable principles and methods,' and whether the expert 'has applied the principles and methods reliably to the facts of the case.'" *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529 (quoting Fed. R. Evid. 702). "The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *Id.* at 529–30. Simply put, the facts must be reliable, and the conclusion must be adequately supported by those facts, for the Court to accept the expert's opinions. *See Gen. Elec. Co. v. Joiner*, 118 S. Ct. 512, 519

(1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). Shurwest asserts that Kennedy's opinions are not reliable because they are based solely on Howard's version of disputed facts. DE 99 at 6. Howard argues that it was appropriate for Kennedy to use the "reliable facts testified to by Ms. Howard" and suggests that the alternative would be for "Mr. Kennedy to believe [Shurwest's] witnesses instead of Ms. Howard or the objective documents." DE 106 at 11.

The Court rejects this challenge. Kennedy is not a fact witness. He opines based on his assumptions about or interpretation of a contested factual record. Obviously, on cross-examination and as a part of its case, Shurwest can dispute, present hypotheticals, and generally erode Kennedy's factual predicates or suppositions. The jury will know that Kennedy is giving opinions with particular foundations. Just because an expert views a case through a lens favorable to one side does not make the opinions unreliable for *Daubert* purposes. The Court will take care to keep Kennedy within the proper boundaries. The factual resolutions will be for the jury, not for any expert to make.

Shurwest also argues that Kennedy's opinions are not reliable because his conclusions are not sufficiently supported by the facts on which he relies. DE 99 at 8–10. The first conclusion that Shurwest points to is Kennedy's opinion that Shurwest owes Howard the standard of care applicable to brokers. *Id.* at 8–9. In doing so, Kennedy refers to the Brokerage General Agency Contract (BGA Contract) between Shurwest and Minn. Life. DE 99-3 at 6. Specifically, Kennedy notes Shurwest's authorizations and responsibilities to, for example, market to and supervise brokers, and from that content concludes that this language establishes that Shurwest is, itself, a broker. *Id.* Ultimately,

9

the Court will not permit Kennedy to make legal characterizations or define the existence or extent of any legal duty. That job belongs to the Court.

The second conclusion that Shurwest points to is Kennedy's opinion that Shurwest is obligated to supervise and manage its employees in relation to their sales activities as an insurance broker. DE 99 at 9–10. In his report, Kennedy opines that "Your Brokers" as defined in the BGA Contract between Shurwest and Minn. Life "certainly include" Shurwest's employees who marketed FIP. Shurwest is correct that Kennedy does not point to factual backing for this conclusion. No documents in the record suggest that Schulze-Miller and her associates are "brokers" as defined in the BGA Contract. It is a significant logical leap to conclude that Schulze-Miller was "certainly" a broker under the BGA Contract, with the same relationship to Minn. Life as Howard, her former client. And again, to the extent Kennedy tries to explicate contracts or discuss imposition of legal duties, that would exceed the proper province of an expert.

Third, Shurwest argues that Kennedy's report and opinions are irrelevant. DE 99 at 10–11. Shurwest first argues that the report is irrelevant as a general matter due to his lack of expertise and unreliable methodology. *Id.* at 11. Further, Shurwest argues that Kennedy's third conclusion, regarding securities law implications, is irrelevant because it is not a question at issue in this case. The Court will permit Kennedy to testify within the limits provided in this Order. Additionally, Shurwest is correct that Kennedy's third conclusion is irrelevant because no issues of securities law pertain in this case; if they did, Kennedy could not give opinions about law.

Fourth, Shurwest argues that Kennedy makes various improper legal conclusions. *Id.* at 11–13. Howard argues that Kennedy does not make legal conclusions regarding

ultimate liability, and thus none of his conclusions are improper. DE 106 at 14–16. Howard's assertion that "none of [Kennedy's] opinions are on the ultimate question of liability" is clearly inaccurate. Shurwest cites multiple instances in which Kennedy is unambiguously opining on Shurwest's ultimate legal liability. *E.g.*, DE 99 at 12 ("Shurwest is responsible for the negligent and what appears to be willful promotion and sale of an investment product (i.e., FIP Note) that was fatally flawed.") (quoting Kennedy Report, p. 6); *id.* ("Accordingly, Plaintiff violated the Act and the Defendant is entitled to the recission of the transaction.") (quoting Kennedy Report, p. 8).

Kennedy has observations that will help the jury understand the market and relationships featured in this case. He can give opinions, properly disclosed, regarding the respective roles. Kennedy can helpfully explain the concept of the IRA Reboot, which is part of Howard's theory, and how the contracts and connections discussed in the record may be consistent with that concept. He can trace potential benefits to Shurwest.  His opinions regarding market or industry standards also will be helpful; this differs from testimony, which the Court will not allow, attempting to discuss imposition of a duty (*e.g.*, who is or is not a fiduciary, under Kentucky law).[4] He also can opine about the reasonable expectations between or of participants, such as the degree to which a broker might reasonably defer to the foundational due diligence of an IMO. The Court will not permit

---

[4] The Court agrees that duty is a question of law. Animating the applicable standard of care, though, may benefit from expert testimony in a complicated area such as the financial relationships here involved. *See Boland-Maloney Lumber Co. v. Burnett*, 302 S.W.3d 680, 686 (Ky. Ct. App. 2009) (Expert testimony is beneficial "in cases involving professionals or professions requiring special skill and expertise[ because] the standard is typically measured by the standard of conduct customary in the profession under the circumstances.").

Kennedy to testify on legal topics, to characterize documents, or to venture beyond the proper boundaries of Rule 702, all as cabined by this Opinion.

### III.    Summary Judgment Framework

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmovant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Courts may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986). "The relevant inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson*, 106 S. Ct. at 2512).

The burden of establishing the absence of a genuine dispute of material fact initially rests with the moving party. *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986) (requiring the moving party to set forth "the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate an absence of a genuine issue of material fact"); *Lindsay*, 578 F.3d at 414 ("The party moving for summary judgment bears the initial burden of showing that there is no material issue in dispute."). If the moving party meets its burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Celotex Corp.*, 106. S. Ct. at 2253;

*Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). However, "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 106 S. Ct. at 2552; *see also id.* at 2557 (Brennan, J., dissenting) ("If the burden of persuasion at trial would be on the *non-moving* party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." (emphasis in original)).

A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 106 S. Ct. at 2510. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 2511; *Matsushita Elec. Indus. Co.*, 106 S. Ct. at 1356 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (citation omitted). Such evidence must be suitable for admission into evidence at trial. *Salt Lick Bancorp v. FDIC*, 187 F. App'x 428, 444–45 (6th Cir. 2006). The summary judgment standard remains the same where the parties pursue cross-motions; the Court "must evaluate each party's motion on its own merits" and, in doing so, "draw all reasonable inferences against the party whose motion is under consideration." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th

Cir. 1991) (citation omitted); *accord Lansing Dairy Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

The parties have proceeded on the assumption that substantive Kentucky law governs this case. This matter is before the Court on the basis of diversity jurisdiction, and thus the substantive law of this state typically would apply. *See Gahafer v. Ford Motor Co.*, 328 F.3d 859, 861 (6th Cir. 2003) ("For purposes of diversity jurisdiction, a federal court is in effect another court of the forum state, in this case Kentucky, and must therefore apply the substantive law of that state.") (citing *Jandro v. Ohio Edison Co.*, 167 F.3d 309, 313 (6th Cir.1999)). The parties do not engage in a choice-of-law analysis; the Court proceeds under the law of the Commonwealth.

## IV.    Shurwest's Declaratory Judgment Action

Shurwest seeks a declaration that it was not involved in Howard's decision to invest in, or recommend that her clients invest in, FIP products, and that Shurwest is not responsible, based on lack of duty or otherwise, for the claimed losses of Howard or her clients. DE 1 at 1 (Complaint ¶ 1).

The Court considers five factors, outline in outlined in *Grand Trunk W. R. Co. v. Consol. Rail Corp.*, 746 F.2d 323 (6th Cir. 1984), in determining whether consideration of declaratory judgment relief is appropriate. The Court quotes at length from Judge Stranch's outline of the *Grand Trunk* analysis:

> The factors, often called the *Grand Trunk* factors after the case that brought the list into being in this circuit, are:
> (1) Whether the declaratory action would settle the controversy;
> (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue;
> (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for res judicata;"

      (4) whether the use of a declaratory action would increase the friction between our federal and state courts and improperly encroach upon state jurisdiction; [which is determined by asking]

      a. whether the underlying factual issues are important to an informed resolution of the case;

      b. whether the state trial court is in a better position to evaluate those factual issues than is the federal court; and

      c. whether there is a close nexus between underlying factual and legal issues and state law and/or public policy, or whether federal common or statutory law dictates a resolution of the declaratory judgment action; and

      (5) whether there is an alternative remedy which is better or more effective.

*W. World Ins. Co. v. Hoey*, 773 F.3d 755, 759 (6th Cir. 2014) (quoting *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546 at 554, 560 (quoting *Grand Trunk W. R. Co.*, 746 F.2d at 326 as to primary factors and quoting *Bituminous Cas. Corp. v. J & L Lumber Co., Inc*., 373 F.3d 807, 814–15 (6th Cir.2004) as to subfactors)).

      The ultimate analysis focuses on the utility of the declaratory judgment remedy and the fitness of the case for federal resolution, matters "peculiarly within the[] grasp" of district courts. *Wilton v. Seven Falls Co.*, 115 S. Ct. 2137, 2144 (1995). The *Grand Trunk* factors capture "underlying considerations of efficiency, fairness, and federalism" and the factorial grading and weighing "depend on the facts of the case." *Hoey*, 773 F.3d at 759. The Court notes that, in diversity cases where state law provides the decisional rule, state interests (forum law, insurance regulation, issue familiarity) will normally emerge for reckoning in at least part of the analysis.

      Here, the factors weigh in favor of the Court maintaining and addressing the merits of this declaratory judgment action. As to the first three factors, the Court's judgment will settle the controversy between the parties and will clarify their legal relationship, and there is no indication that this action was brought for the purpose of procedural fencing. At least, there is not a competing state action for consideration. Though state law questions are at

issue here, there is no state court to which to defer, and the Kentucky law at issue is not especially novel. Finally, though Shurwest could have brought this action in state court, federal court is not a clearly inferior forum, and Shurwest properly elected to bring this action in a federal forum. The parties agree that this case is properly before the Court. Because the counterclaim essentially presents the full dispute in one forum, this favors unitary resolution.

In its Motion for Partial Summary Judgment, Shurwest seeks summary judgment on its declaratory judgment claim as to liability for any losses tied to Howard client Lee Anne Walmsley. DE 55.[5] In turn, Howard moves for summary judgment on Shurwest's declaratory judgment action as a whole. DE 94. The Court denies both Howard's Motion for Summary Judgment (DE 94) and Shurwest's Motion for Partial Summary Judgment. DE 55. Simply put, the declaratory judgment request puts in clear relief the merits of the overall case, merits subsumed within Howard's own counterclaim content. The Court views the case as one requiring various jury determinations; no one gets a full judgment as a matter of law.

### a. *Howard's Motion for Summary Judgment*

Howard argues that she is entitled to summary judgment on Shurwest's declaratory judgment action because (1) Shurwest does not support its claim with expert testimony, (2) Shurwest does not rebut the report of Howard's expert, and (3) common law establishes that Shurwest owed Howard a duty of care. DE 94 at 1.

---

[5] The Court admits doubt about how Ms. Walmsley's losses here fit. She is not a party. To the extent Howard has liability to Walmsley, perhaps this case can enfold issues of other fault or responsibility in contributing to such losses. That remains an open procedural question, in the Court's eyes.

First, Howard argues that expert testimony is required to establish what duty Shurwest owed to Howard, and therefore that the Court should enter summary judgment in her favor because Shurwest does not support its claim, or rebut the report of Howard's expert, with its own expert testimony. DE 94 at 10–13. Shurwest counters that expert testimony is not necessary in this instance.

Under Kentucky law, "in cases involving professionals or professions requiring special skill and expertise, the standard is typically measured by the standard of conduct customary in the profession under the circumstances. . . [and, i]n such cases, expert testimony is typically required to establish the standard of care." *Boland-Maloney Lumber Co. v. Burnett*, 302 S.W.3d 680, 686 (Ky. Ct. App. 2009) (citations omitted). This rule has been implemented across various professions. *See, e.g.*, *EQT Prod. Co. v. Vorys, Sater, Seymour & Pease, LLP*, No. 15-CV-146-DLB-EBA, 2018 WL 1996797 (E.D. Ky. Apr. 27, 2018) (law); *Muhammad v. United States*, No. 08-CV-131-KKC, 2009 WL 3161481 (E.D. Ky. Sept. 28, 2009) (medicine); *Davidson v. King*, No. 2012-CA-001273-MR, 2014 WL 1680461 (Ky. Ct. App. Apr. 25, 2014) (budget advisor). "[T]here is an exception to the rule in situations where the common knowledge or experience of laymen is extensive enough to recognize or to infer negligence from the facts." *Jarboe v. Harting*, 397 S.W.2d 775, 778 (Ky. Ct. App. 1965) (citations omitted). The question is, then: is expert testimony necessary in this case?

Shurwest is an IMO. "IMOs recruit independent insurance agents to sell . . . insurance products to the independent agents' clients. An IMO serves as a third-party intermediary between the agents and the insurance companies, providing product education, marketing, and distribution services." *Mkt. Synergy Grp., Inc. v. United States*

*Dep't of Labor*, No. 16-CV-4083-DDC-KGS, 2016 WL 6948061, at *3 (D. Kan. Nov. 28, 2016). On its face, the role of IMOs does not seem so complex as to **require** specialized expertise or skill to understand. While the layman may not know the ins and outs of the insurance industry, American jurors surely understand marketing. Howard insists that the standard of care applicable to Shurwest is beyond lay knowledge, but she fails to point to what aspect of this business relationship is so specialized or esoteric as to require expert testimony.

“Whether expert testimony is required in a given case is squarely within the trial court's discretion.” *Green v. Owensboro Med. Health Sys., Inc.*, 231 S.W.3d 781, 783 (Ky. Ct. App. 2007) (citing *Keene v. Commonwealth*, 516 S.W.2d 852, 855 (Ky.1974)). In its discretion, the Court finds that this is not a case “where the standard of care is so unique and specialized that it requires expert testimony.” *Dempsey v. City of Lawrenceburg*, No. CIV.A. 3:09-33-DCR, 2010 WL 3924525, at *3 (E.D. Ky. Sept. 29, 2010). Further, the case, at its center, does not rise or fall on defining a specialized care standard. Really, the case is about honesty, the accuracy of factual representations, and the understanding of Howard as she dealt with Schulze-Miller, her underlings, and the entities from transaction to transaction. Expert testimony may be useful on background, but the case hinges on human dealings, not arcane professional practices.

Howard also argues that summary judgment is appropriate because Shurwest owed Howard a duty of care as a matter of law since it had a business relationship with Howard and Shurwest employees Schulze-Miller, Johnson, and Seabolt acted with actual and apparent authority to market FIP products to Howard on Shurwest's behalf. DE 94 at 13–19.

The Court notes as a preliminary matter that, despite Howard's insistence to the contrary, the assertions in her summary judgment motion do not cover the full scope of Shurwest's declaratory action. Though Howard quotes the full text of Shurwest's prayer for relief in her reply (DE 105 at 7), she ignores the final clause. Shurwest asks the court to "declare that Shurwest owed no duty relating to FIP or any investment in FIP, and that Shurwest is not responsible for any loss at the hands of FIP." DE 1, at 9 (Complaint ¶ 28). Howard's summary judgment motion addresses only the question of whether Shurwest owed a duty, not whether the Company ultimately faces liability for any loss. In any event, a jury must pass on all of the core questions presented.

Neither party denies that Shurwest and Howard certainly had a business relationship in which Shurwest marketed products to Howard, and thus owed her a potential duty of reasonable care as to its activities with respect to those products.[6] The parties disagree, however, on whether Shurwest owed Howard a duty regarding the FIP products marketed by Shurwest employees Schulze-Miller, Johnson, and Seabolt. Shurwest contends that these individuals were acting outside the scope of their employment and without the permission or knowledge of Shurwest when marketing FIP products, relieving Shurwest of any duty relating to those actions. Howard contends, to the contrary, that Schulze-Miller and her associates were acting as agents of Shurwest when marketing

---

[6] *See Morris Aviation, LLC v. Diamond Aircraft Indus., Inc.*, 536 F. App'x 558, 567 (6th Cir. 2013) ("One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.") (citing Restatement (Second) of Torts § 552(1) (Am. L. Inst. 1977)).

FIP products to her, meaning that Shurwest did, in fact, have a duty to Howard relating to those products.

Howard argues that Shurwest employees acted with actual authority from Shurwest when they marketed FIP products. Actual authority exists when a principal expressly grants the agent authority to act on its behalf. *Kindred Nursing Centers Ltd. P'ship v. Brown*, 411 S.W.3d 242, 249 (Ky. Ct. App. 2011). "Agency cannot be proven by a mere statement, but it can be established by circumstantial evidence including the acts and conduct of the parties such as the continuous course of conduct of the parties covering a number of successive transactions." *Mill St. Church of Christ v. Hogan*, 785 S.W.2d 263, 267 (Ky. Ct. App. 1990). Howard argues that because Schulze-Miller and her associates had authority to communicate with Howard and other clients as a general matter, that actual authority also existed regarding FIP products.

Shurwest has put forth several documents to show that the Company did not bestow on its employees the authority to market FIP, including the declarations of all three employees involved. *See* DE 45-2 at 2 (Schulze-Miller Decl. ¶ 5) ("Shurwest management rejected my request to form a relationship between Shurwest and FIP and to refer, sell, or wholesale FIP products. Shurwest management also never approved using FIP as a funding source for individuals to make life insurance premium payments."); DE 100-2 at 15 (Johnson Decl. ¶ 12) ("Ms. Schulze-Miller and I explained to the Advisors that we referred to FIP, and others that I dealt with regarding FIP, that our work related to FIP was separate from Shurwest."); DE 100-2 at 18 (Seabolt Decl. ¶ 6) ("Ms. Schulze-Miller . . . stated that Shurwest did not approve of, offer or sponsor FIP products and that they were not sold through Shurwest."). The declaration of Jim Maschek, Shurwest's Manager and Head of

Distribution, similarly provides that the FIP-related conduct was not authorized. *See* DE 100-2 at 3 (Maschek Decl. ¶ 8) ("Schulze-Miller . . . sought Shurwest's approval to market or promote FIP products. Shurwest denied that request. Shurwest management have never approved marketing or promoting FIP as a funding source for individuals to make life insurance premium payments."). FIP itself supports Shurwest's argument. *See* DE 100-2 at 12 (FIP Letter) ("Shurwest[] has never referred any business to FIP LLC. Furthermore, they have never contracted with FIP LLC or made any compensation off the sales of FIP LLC product."). The Court finds that the FIP purveyors did not act with actual authority granted by Shurwest; indeed, they transgressed Shurwest's position on the FIP products.

Howard alternatively argues that Schulze-Miller acted with apparent authority on Shurwest's behalf when she (and her underlings) marketed FIP products. "Apparent authority is created when the principal holds out to others that the agent possesses certain authority that may or may not have been actually granted to the agent." *Kindred Nursing Centers Ltd. P'ship*, 411 S.W.3d at 249; *see also Mill St. Church of Christ*, 785 S.W.2d at 267 ("It is a matter of appearances on which third parties come to rely."). Howard argues that since Shurwest held out Schulze-Miller, Johnson, and Seabolt as employees of Shurwest, and placed them in position to influence and market to Howard, that apparent authority permeates those individuals' marketing of FIP products as well. Howard points specifically to her meeting with Schulze-Miller at Shurwest headquarters and Schulze-Miller and Johnson's use of Shurwest email addresses to conduct FIP business as demonstrating apparent authority on which Howard reasonably relied.

In its response, Shurwest points particularly to the second requirement of apparent authority: reasonable belief. Shurwest argues that Schulze-Miller's generic disclaimers

about FIP not going through Shurwest, as well as the disclaimers at the bottom of certain MJSM email messages, show that Howard does not meet the reasonable belief prong. DE 103 at 19–20; *see* DE 100-3 at 116 (Johnson Email to Howard) ("Structured Cash Flow products are offered through Future Income Payments. Shurwest Financial Group does not represent nor is affiliated with Future Income Payments.").

Apparent authority, its existence or not, is a linchpin in this case. A jury must decide the issue. Shurwest undoubtedly made certain manifestations to Howard when it flew her across the country for a day at Shurwest's headquarters. She underwent a day of sales programs and pitches, including one by Schulze-Miller, Shurwest's National Sales Director of Life Insurance. According to Howard, Schulze-Miller, within the schedule set by Shurwest, pitched her on the FIP notes and the IRA Reboot. Howard's contemporaneous notes, *see* DE 111-1 at 18–20, corroborate a presentation linking Minn. Life IUL products with structured notes. Would a reasonable person receiving this sales presentation attribute it to Shurwest? After that presentation, in short order, Howard became a Minn. Life producer (via Shurwest) and signed and returned the FIP producer agreement (via Shurwest, naming Shurwest as the "Referral/Marketing Group," and processed through Schulze-Miller and her Shurwest email address). Maybe Schulze-Miller used that address in an "inadvertent" way, but Howard—who has the governing perspective--claims that Schulze-Miller pitched the FIP products as commonly used by and vetted by Shurwest.

The Johnson disclaimer—fairly far down the email history and, of debatable prominence, and perhaps ambiguous as to the Shurwest entity name—may register with the jury. The jury may also find the transmittals, the agreement content, and the overall course problematic for Howard. In the Court's view, on assessment of the full record, a

reasonable jury could decide the apparent authority question either way, foreclosing a dispositive pre-trial ruling. *See Dones v. Super Serv., Inc.*, 2006 WL 2382743, at \*5 (Ky. Ct. App. 2006) ("[T]he nature of her understanding of the arguable apparent authority of [defendant's employee] was indeed an issue of fact rendering inappropriate and premature the entry of summary judgment[.]").

### b.  Shurwest's Motion for Partial Summary Judgment

Shurwest seeks partial summary judgment on its declaratory judgment claim, specifically as it relates to liability for Walmsley's losses. DE 55 at 1. In Shurwest's view, Howard had a fiduciary duty to Walmsley, which she breached, and Shurwest breached no duty to Walmsley. *Id.* at 8–12. Howard argues in response that she would not have recommended the FIP structured notes to Walmsley had Shurwest not made representations to her about them being safe investments, making Shurwest ultimately responsible for Walmsley's FIP-related losses. DE 111 at 19.

Certainly, as noted already, a jury must determine what happened here and whether Shurwest is chargeable for the conduct of its relevant employees. Howard's version supports the view that Schulze-Miller and her team prompted or induced Howard to become an FIP producer through a series of tortious misrepresentations or misstatements. Howard likely owed Walmsley a duty of care, perhaps even a fiduciary duty. Whether Shurwest has responsibility for FIP-related losses depends on resolution of what the actors did within their employment scope, whether Shurwest infused the actors with apparent authority, and whether the conduct ultimately is actionable. Howard's conduct also merits full evaluation, but Shurwest has cited nothing to suggest that just because Howard had an independent duty to Walmsley, that the duty would somehow eliminate assessment of Shurwest's role. Kentucky is a comparative fault state and normally accounts for the fault

23

of all parties relative to a tort. *See* Ky. Rev. Stat. Ann. § 411.182(1) ("In all tort actions . . . involving fault of more than one (1) party to the action, . . . the court, unless otherwise agreed by all parties, shall instruct the jury to answer interrogatories or, if there is no jury, shall make findings indicating: (a) The amount of damages each claimant would be entitled to recover if contributory fault is disregarded; and (b) The percentage of the total fault of all the parties to each claim that is allocated to each claimant, defendant, third-party defendant, and person who has been released from liability under subsection (4) of this section."). The Court declines a dispositive ruling.

## V.   Howard's Counterclaims

Howard brings seven counterclaims (DE 10), and Shurwest moves for summary judgment on each of them. DE 100.[7] Each claim turns on the actions of former Shurwest employees Schulze-Miller, Johnson, and Seabolt. Thus, the claims foundationally depend on whether Shurwest is responsible for the conduct of these individuals, if actionable, under the circumstances of this case. Accordingly, the Court will first address Count 7 (Respondeat Superior/Vicarious Liability) and then move on to Counts 1 through 6.

### a.  *Respondeat Superior/Vicarious Liability*

The parties' focus is traditional imputed liability. An employer is liable for the tortious conduct of its employee if "the employee . . . was acting within the scope of his employment at the time of his tortious act." *Osborne v. Payne*, 31 S.W.3d 911, 915 (Ky. 2000) (citation omitted). Kentucky courts consider four factors to determine whether an employee's conduct is within the scope of employment: "(1) whether the conduct was

---

[7] Shurwest previously moved for partial summary judgment on Howard's counterclaims, to the extent that they related to Walmsley's losses. DE 55 at 1. Shurwest incorporates its DE 55 arguments into its subsequent summary judgment motion. DE 100 at 13.

similar to that which the employee was hired to perform; (2) whether the action occurred substantially within the authorized spacial and temporal limits of the employment; (3) whether the action was in furtherance of the employer's business; and (4) whether the conduct, though unauthorized, was expectable in view of the employee's duties." *Coleman v. United States*, 91 F.3d 820, 824 (6th Cir. 1996).

As to the first factor, "the duties of an employee include those that he or she is 'expressly or impliedly' hired to perform." *Id.* (quoting *Marcum v. United States*, 324 F.2d 787, 790 (6th Cir.1963)). As a general matter, Shurwest employed Schulze-Miller and Johnson in its IMO business, for the purpose of "market[ing] annuities and insurance products to retirement planners." DE 1 at 2 (Complaint ¶ 6). Here, Schulze-Miller and Johnson's marketing of FIP products to Howard is, in one way, similar to Shurwest's marketing of Minn. Life Insurance products to Howard. *See id.* at 4 (Complaint ¶ 13) ("Just as Shurwest was the IMO in the relationship between Minn. Life and Howard, MJSM was the IMO in the relationship between FIP and Howard."). Further, Schulze-Miller occupied an elevated sales position for Shurwest, that of National Sales Director. Her (as alleged) initial contact with, and pitch to, Howard, which fused the insurance and note products via the IRA Reboot, was directly within that marketing genre indicated by her title.

The second factor is mixed. It is clear that Schulze-Miller and Johnson were Shurwest employees at the time that they were marketing FIP products to Howard. Howard also asserts that Schulze-Miller introduced Howard to FIP products at Shurwest's corporate headquarters during a Shurwest-sponsored junket, and Shurwest does not dispute that assertion. DE 10 at 5. Howard also establishes that Schulze-Miller and Johnson communicated with her about FIP, in part, via their Shurwest emails accounts. *See* DE 107-

25

1 at 63–76. However, other of Howard's communications with Schulze-Miller and Johnson regarding FIP products occurred through Schulze-Miller and Johnson's MJSM emails. This factor has ambiguous indicia.

The third factor relates to a highly contested question of fact. Howard asserts that the FIP transactions furthered Shurwest's business because they, via the linked insurance purchase, "resulted in $25,542.98 in commissions." DE 107 at 12.[8] Howard claims she individually purchased FIP products as part of the IRA Reboot strategy through Shurwest, which also involved the purchase of a Minn. Life policy or policies. DE 94 at 8; DE 110 at 2; DE 96. Shurwest received commissions totaling $25,542.98 from Howard's Minn. Life policy purchases. *Id.*; DE 96. Shurwest argues that it did not receive any benefit from the FIP products because all FIP-related commissions were paid directly through MJSM, and Shurwest received no referral fees. DE 100 at 9. Shurwest supports this argument with declarations from Schulze-Miller and Johnson. *See* DE 100-2 at 9 (Schulze-Miller Decl. ¶¶ 9–10) ("All commissions FIP paid pursuant to my relationship with FIP were made directly to MJSM. Shurwest received no referral fees from FIP or MJSM for my FIP related activities. Shurwest management did not know about MJSM, my referral fee relationship with FIP or any FIP-related commissions received by me other others. None of the commission payments flowed through Shurwest."); *see also* DE 100-2 at 14 (Johnson Decl. ¶ 7) ("All compensation I received relating to offering or promoting FIP products were paid to me by MJSM. I understand that Shurwest did not receive referral fees, commissions, or other compensation from FIP or MJSM relating to my offering or promoting FIP

---

[8] Howard cites to Exhibit C of her Motion for Summary Judgment on Shurwest's Complaint. *See* DE 94 (Motion) & 96 (Exhibit C).

products."). There is no evidence that Shurwest received any funds relating directly to FIP products.

The jury must resolve the disputed factor. Shurwest tries to wall off the Minn. Life benefit, but Howard's theory is that Schulze-Miller had a strategy linking the FIP notes with life insurance products, including those offered by Minn. Life. This was her pitch to Shurwest (which the Company rejected). This was the pitch she allegedly persisted in with Howard. If part of her enduring strategy involved life insurance brokered through Shurwest, then part of that strategy may have been to benefit Shurwest. Importantly, Kentucky does not require that the employer benefit be primary or even preponderant. If **any part** of the employee's action is to benefit the employer, the action may fall within the scope of employment. *See Coleman*, 91 F.3d at 825 ("Reinforcing our conclusion on this point is the insistence of Kentucky courts that the employee conduct in question need only be done *in part* to benefit the employer."); *Williams v. Seven Ctys. Servs., Inc.*, 2015 WL 2445509, at *5–7 (Ky. Ct. App. 2015) (noting that employee's action must only be "actuated at least in part by a purpose to serve the master," that master can be liable if the servant's purpose "however misguided, is wholly or in part to further the master's business" and that the servant is beyond scope "when the employee acts for solely personal reasons") (citations omitted). Per *Williams*, "[t]he determinative question is whether [the act] was motivated, at least in part, by the agent's desire to benefit his employer." *Id.* The question here is worthy of much debate, but the financial flow to Shurwest is clear, inferentially at least, and, in the summary judgment framework, demonstrates a fact question. Schulze-Miller and her crew's conduct is "action, however misguided, that a jury could find to have been undertaken at least in part to benefit [Shurwest]." *Id.*

The fourth factor weighs against liability. It was not "expectable" that Schulz-Miller, after being told by Shurwest management not to promote FIP products, would create her own shadow entity to market FIP products to Shurwest's clients. Indeed, there is no significant indication that Shurwest knew or should have suspected what Schulze-Miller and her associates were up to.[9] Schulze-Miller took many steps to avoid detection by Shurwest management, creating a separate company and email domain through which to communicate about FIP products. Surely, Shurwest should not "expect" its employees to create new companies and poach other employees to end run the directives of its management. This weighs in Shurwest's favor, but not dispositively.

The Court finds that there are fact questions the jury must resolve on the question of employment scope and vicarious liability. Also, the Court earlier referenced the apparent authority questions. It is important to note that an employer can be vicariously liable for an employee's torts, under Kentucky law, in two ways. First, if the employee acted within the scope of employment. Second, if the employee acted with the employer's apparent authority. *Williams v. St. Claire Med. Ctr.*, 657 S.W.2d 590, 595–96 (Ky. Ct. App. 1983) ("Unquestionably Kentucky courts have recognized, and have applied, the doctrine of apparent authority."); *Paintsville Hosp. Co. v. Rose*, 683 S.W.2d 255, 257–58 (Ky. 1985) (applying principle in tort context and acknowledging Restatement (Second) of Agency § 267 and "liability to the third person for harm caused by the lack of care or skill of the one

---

[9] Shurwest repeatedly touts an Arizona District Court decision about the players. *See Landmark Am. Ins. Co. v. Shurwest, LLC*, No. CV-19-04743-PHX-SRB, 2020 WL 5434550 (D. Ariz. July 23, 2020). The Court gives due respect to the non-binding analysis in a case where Howard was not a party. That case involved insurance coverage and did not resolve or address scope of employment, vicarious liability, or agency. It did explain Shurwest's lack of notice as to Schulze-Miller's behavior.

appearing to be a servant or other agent as if he were such"); Restatement (Third) of Agency § 7.03(2)(a)-(b); Restatement (Second) of Agency § 219(2)[10]. Here, fact questions under either imputed liability mechanism preclude summary judgment.

    *b.  Fraud*

    In Count 1, Howard alleges that Shurwest defrauded Howard "both by affirmative misrepresentations and/or by intentional concealment through the representations made to Ms. Howard during the in-person meeting in February 2017 and through its subsequent representations to Ms. Howard about FIP and the features of the FIP structured notes." DE 10 at 17 (Counterclaim ¶ 30).

    Under Kentucky law, a claim of "[f]raud requires proof of six elements: material misrepresentation by the defendant; falsehood; making of a statement known to be false; to induce action by the plaintiff; reliance by the plaintiff; and injury to the plaintiff." *Snowden v. City of Wilmore*, 412 S.W.3d 195, 209 n. 10 (Ky. Ct. App. 2013) (citing *Cresent Grocery Co. v. Vick*, 194 Ky. 727, 240 S.W. 388, 389 (1922)). Howard asserts that, during their February 2017 meeting, Schulze-Miller represented to Howard that Shurwest performed due diligence on FIP products and that they were "safe" and presented "no risk." DE 107 at 13–14; DE 111-1 at 3–4 (Howard Decl. ¶¶ 5–8). Further, Howard specifically alleges that Schulze-Miller represented that she acted for Shurwest, that FIP had an A+ BBB rating, that FIP had a perfect payment record, that Shurwest regularly used FIP

---

[10] There's yet another sub-variant in the cases: the concept that an employee's position may facilitate commission of a tort, thus hooking the employer. This, a cousin of apparent authority, derives as well from Restatement (Second) of Agency, § 219(2)(d). *See Am. Gen. Life v. Hall*, 74 S.W.3d 688, 692 (Ky. 2002) (applying in sexual harassment context: "the agent was aided in accomplishing the sexual harassment by the existence of the agency relationship"). This, too, would cut against a dispositive resolution in Shurwest's favor.

products as part of the developed IRA Reboot strategy, and that Shurwest employed the strategy with multiple clients. *Id.* at 3, 5 (Howard Decl. ¶¶ 7, 13). She avers reliance on these representations in entering the relationships and making the FIP purchases at issue. *Id.* at 5 (Howard Decl. ¶ 15). Howard further states that she would not have invested money in FIP, or recommended that Walmsley do so, if Shurwest employees had not assured her that the company and products were screened and safe. *Id.* at 7 (Howard Decl. ¶ 21).

Shurwest argues that Schulze-Miller and Johnson did not make any material misrepresentations to Howard, asserting that any statements made about FIP products were opinions about future performance and not actionable misrepresentations. DE 100 at 20; *see Flegles, Inc. v. TruServ Corp.*, 289 S.W.3d 544, 549 (Ky. 2009) ("The misrepresentation, moreover, must relate to a past or present material fact. 'A mere statement of opinion or prediction may not be the basis of an action.'") (quoting *McHargue v. Fayette Coal & Feed Co.*, 283 S.W.2d 170, 172 (Ky.1955)). Shurwest further points to an email exchange in which Johnson suggests to Howard that she do her own due diligence on the FIP products. DE 100-3 at 115. Shurwest argues that Howard's reliance on any misrepresentation was unreasonable. DE 100 at 21; *see Flegles, Inc.*, 289 S.W.3d at 549 ("The plaintiff[']s reliance, of course, must be reasonable[;] . . . the law imposes upon recipients of business representations a duty to exercise common sense.") (citation omitted). Here, Howard signed an agreement with FIP and initialed next to various stated risks, including a statement perhaps suggesting that FIP's products were on, at best, shaky legal ground. *See* DE 102 at 11 (FIP Agreement § 6.3) (noting that the law around these transactions is "unsettled" and providing that "[i]n the event law prohibiting such transactions were passed, it is unknown whether the Purchaser[] would receive all of the

payments comprising the Purchased Asset, and **FIP may not be able to recover any of the purchase price paid to the Seller resulting in the Purchaser suffering a significant loss on the Purchase Price of the Purchased Asset.**") (emphasis added). *See Fifth Third Bank v. Waxman*, 726 F. Supp. 2d 742, 752 (E.D. Ky. 2010) ("[Under Kentucky law,] parties may not base a fraud in the inducement claim on their reliance on oral representations contrary to the terms of written agreements or disclaimers that they have acknowledged in writing.") (citing *Rivermont Inn, Inc. v. Bass Hotels & Resorts, Inc.*, 113 S.W.3d 636, 640 (Ky. Ct. App. 2003)).

The fraud claim is triable. Certainly, there will be conflicting proof on what Howard knew, what prompted her decisions, whether she acted reasonably,[11] and whether she clears each elemental gate. However, the direct factual representations by the Shurwest actors all fairly supply the foundation for a fraud claim here, which the jury must assess.

> c.  *Constructive Fraud*

In Count 2, Howard alleges constructive fraud, on the basis that Shurwest "occupied a position of trust with respect to Ms. Howard," and committed fraudulent acts against her "through both affirmative misrepresentations and by intentional and/or reckless concealment of material information." DE 10 at 18 (Counterclaim ¶¶ 39–40). "[C]onstructive fraud arises from the breach of a legal duty which the law would pronounce fraudulent because of its tendency to deceive others, violate confidence, or injure public interest." *Kendrick v. Bailey Vault Co.*, 944 S.W.2d 147, 150 (Ky. Ct. App. 1997) (citing

---

[11] Howard initialed the FIP contract, but Schulze-Miller and Johnson had provided several significantly fortifying factual statements that could have impacted Howard's perceptions. The vouching—that Shurwest regularly employed the product, that FIP had a perfect history and A+ rating, Johnson's specific statements regarding the legal vetting and government approvals—goes into the factual mix and, on summary judgment, precludes a dispositive ruling.

*Wood v. Kirby, Ky.*, 566 S.W.2d 751 (1978)). "A constructive fraud claim arises out of a material misrepresentation by a defendant in a fiduciary relationship with the plaintiff." *Cutter v. Ethicon, Inc.*, No. CV 5:19-443-DCR, 2020 WL 109809, at *10 (E.D. Ky. Jan. 9, 2020) (citing *Nash-Finch Co. v. Casey's Foods, Inc.*, 762 F. App'x 218, 224 (6th Cir. 2018)).

Howard argues that Shurwest owed her a fiduciary duty, based on the report of Peter Kennedy, Howard's expert. The Court pays Kennedy no heed on the legal issue of fiducial status. Howard depicts a business-customer relationship, nothing imbued with the characteristics found in a relationship of trust. The lack of any facts or law supporting fiduciary status forecloses constructive trust as an actionable theory. *See In re Merrill Lynch Auction Rate Sec. Litig.*, 765 F. Supp. 2d 375, 387–88 (S.D.N.Y. 2011) (applying Kentucky law and declaring that "[f]iduciary relationships only arise where a party . . . shows 'the parties understood and agree that confidence is reposed by one party and trust accepted by the other . . . that one party would be acting in the interest of the other.'") (citation omitted); *id.* ("A fiduciary duty 'requires more than the generalized business obligation of good faith and fair dealing.'") (citation omitted). The arms-length interactions here may have involved fraud and misrepresentations, but the relationship was not fiduciary, foreclosing the constructive fraud count.

### d.  Negligent Misrepresentation

In Count 3, Howard argues that, if the Court finds that Shurwest did not possess the specific intent to defraud Howard, then the misrepresentations alleged were yet made negligently. DE 10 at 19 (Counterclaim ¶¶ 46–47). A negligent misrepresentation claim "requires an affirmative false statement[,]" an omission is not sufficient. *Giddings & Lewis, Inc. v. Indus. Risk Insurers*, 348 S.W.3d 729, 746 (Ky. 2011) (citing *Republic Bank & Trust*

*Co. v. Bear, Stearns & Co.*, 707 F.Supp.2d 702, 714 (W.D. Ky. 2010)). "Kentucky follows the Restatement in holding liable for pecuniary loss a person who, (1) in the course of his business or a transaction in which he has a pecuniary interest, (2) supplies false information for the guidance of others in their business transactions, if (3) he fails to exercise reasonable care or competence in obtaining or communicating the information and (4) the plaintiff justifiably relied on the information." *Republic Bank & Tr. Co.*, 707 F. Supp. 2d at 713 (citing *Presnell Constr. Managers, Inc. v. EH Constr.*, LLC, 134 S.W.3d 575, 580 (Ky. 2004)). The Court finds the representations made by Schulze-Miller and her operatives actionable under this theory, for many of the same reasons discussed in the fraud section. The representations were factual, bolstered the attractiveness of the FIP notes option, and reported a series of positive empirical attributes (Shurwest's vetting, Shurwest's regular use, third-party vetting and approval, historical performance, risk) designed (it is reasonable to infer) to influence Howard's decision making. A jury may well reject the elements, but the jury must decide whether Howard can prove the claim.

### e. Negligence

In Count 4, Howard alleges that Shurwest breached its duty of care and duty to refrain from making any material misrepresentations, causing Howard monetary, reputational, and emotional harm. DE 10 at 20 (Counterclaim ¶¶ 54–58). A plaintiff must prove three elements to establish negligence: "that (1) the defendant owed the plaintiff a duty of care, (2) the defendant breached the standard by which his or her duty is measured, and (3) consequent injury." *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 88 (Ky. 2003). "Consequent injury" requires both "actual injury or harm to the plaintiff and legal causation between the defendant's breach and the plaintiff's injury." *Id.* at 88–89. Legal causation exists where the negligent conduct is a "substantial factor" in causing the harm, meaning

the "conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause, using that word in the popular sense, in which there always lurks the idea of responsibility." *Id.* at 92. To the extent this count alleges negligence related to representations, the Court treats it as subsumed within the prior discussion. To the extent it asserts negligence in supervision, the Court references the subsequent discussion of Shurwest's supervisory conduct. The Court sees no freestanding negligence claim for further analysis.

### f.   Violation of the Kentucky Consumer Protection Act

In Count 5, Howard alleges that Shurwest violated the Kentucky Consumer Protection Act (KCPA). DE 10 at 21 (Counterclaim ¶¶ 61–65). The KCPA outlaws any "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Ky. Rev. Stat. Ann. § 367.170. Howard argues that Shurwest misled Howard through its employees' promotion of FIP products. DE 107 at 24.

Howard may not bring this action under the KCPA. The KCPA provides that an action may be brought by a "person who purchases or leases goods or services **primarily for personal, family or household purposes**." Ky. Rev. Stat. Ann. § 367.220(1) (emphasis added). Here, Howard was conducting business transactions in her professional capacity as a financial planner. Schulze-Miller targeted her in that express capacity—Howard became a producer for FIP. Though Howard did ultimately purchase FIP products for herself, that surely was not the "primary" purpose of her interactions with Shurwest, or with the Schulze-Miller group. Most of Howard's claims persist, but this statutory claim fails. *See Suhail v. Univ. of the Cumberlands*, 107 F. Supp. 3d 748, 760 (E.D. Ky. 2015) (holding that the KCPA does not apply to a student's decision to seek a degree because the purpose of the degree was to obtain employment and compensation, making the transaction

professional in nature). Thus, the Court grants summary judgment to Shurwest on Count 5 of Howard's Counterclaim (Violation of the Kentucky Consumer Protection Act).

### g.  *Negligent Supervision*

In Count 6, Howard alleges that "Shurwest was negligent and breached its duties pertaining to the training, supervising educating, qualifying, managing[,] and monitoring of Mr. Johnson and Ms. Schulze-Miller." DE 10 at 22 (Counterclaim ¶ 70). "To succeed in a negligent-supervision cause of action, a claimant must plead and prove the traditional common-law elements of negligence, including duty, breach, an injury, and legal causation linking the defendant's breach to the plaintiff's injury." *Cummins v. City of Augusta*, No. 2012-CA-001641-MR, 2013 WL 5436657, at *4 (Ky. Ct. App. Sept. 27, 2013) (citation omitted). Under Kentucky law, "an employer may be held liable for negligent supervision only if he or she knew or had reason to know of the risk that the employment created." *Booker v. GTE.net LLC*, 350 F.3d 515, 517 (6th Cir. 2003) (citation omitted).

Howard argues that "Shurwest was aware or should have been aware of Mr. Johnson and/or Ms. Schul[ze]-Miller's marketing and promotion of FIP Structured Notes." DE 10 at 22 (Counterclaim ¶ 68). It has been established, without contradiction, that Schulze-Miller asked Shurwest management to market FIP products and that Shurwest denied the request. Following that denial, Schulze-Miller established her own company, MJSM, so that she could market FIP products anyway. Howard argues that Shurwest should have done more to supervise Schulze-Miller to ensure that she did not contravene Shurwest management to market FIP products. DE 107 at 22–23. Essentially, Howard's argument implies that it was Shurwest's duty to assume that its employees would disobey direct orders and create entire new entities to conceal prohibited activity. In order for Shurwest to have known what Schulze-Miller and her associates were up to, it would have

had to read or screen the content of every email sent or received by its employees. Surely, it is not reasonable for the Court to require a company to micromanage its employees to that degree in order to avoid negligence liability. Nothing in the record suggests that Shurwest had reason to doubt or suspect Schulze-Miller or Johnson, both senior or high-level employees. Without a "reason to know of the employee's harmful propensities" the tort will not lie. *Grand Aerie FOE v. Carneyhan*, 169 S.W.3d 840, 844 (Ky. 2005). Accordingly, the Court grants summary judgment to Shurwest on Count 6 of Howard's Counterclaim (Negligent Supervision).

## VI.   Judicial Notice

Howard moves for judicial notice of the fact that Melanie Schulze-Miller was indicted in the United States District Court for the District of South Carolina, as well as the charging document itself. DE 85 at 1. Shurwest responded, providing that it does not oppose judicial notice of the fact that Schulze-Miller was indicted, but objecting to Howard's commentary on the application of the indictment to this matter. DE 88 at 1. In turn, Shurwest seeks judicial notice of the findings of Judge Susan R. Bolton in a District of Arizona case regarding Shurwest, Schulze-Miller, and MJSM. *Id.* at 1–2. Howard filed a reply in support of her motion for judicial motion and response objecting to Shurwest's motion.[12] DE 93-1. These are largely make-work motions that do little to advance the case.

A court "may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can

---

[12] Howard's reply was filed late, and thus she moved for leave to file the reply *instanter*, noting that filing serves both as a reply relating to her own motion and a response to Shurwest's motion and that granting leave will not prejudice Shurwest. DE 93. Finding no prejudice against Shurwest, the Court grants Howard's request and accepts her reply. DE 93-1.

be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Further, a court "may take judicial notice of proceedings in other courts of record." *Granader v. Pub. Bank*, 417 F.2d 75, 82 (6th Cir. 1969) (citations omitted). However, "it is generally not appropriate to judicially notice findings of fact made in other cases." *Marshall v. Bramer*, 828 F.2d 355, 358 (6th Cir. 1987). Accordingly, the Court takes notice of the fact that Melanie Schulze-Miller was charged with wire fraud and conspiracy to commit fraud in the District of South Carolina (DE 85-1 at 7–10). Additionally, the Court takes notice of the fact that Judge Bolton issued a summary judgment order that addresses, in a coverage dispute, the relationships between Shurwest, Schulze-Miller, and MJSM in another matter. *Landmark Am. Ins. Co. v. Shurwest, LLC*, No. CV-19-04743-PHX-SRB, 2020 WL 5434550 (D. Ariz. July 23, 2020); DE 88-1. The Court does not, however, adopt or credit the allegations contained in the Schulze-Miller indictment and does not treat Judge Bolton's findings of fact as its own. Further, whether any of these materials see the light of day at any trial is not something this decision addresses.

## VII.   Howard's Objection to Denial of Motion to Compel

Howard moved to compel Shurwest to produce various documents in discovery. DE 86. Shurwest responded, opposing the motion (DE 89), and Howard replied. DE 91. Judge Atkins granted the motion in part and denied it in part. DE 92. Howard timely objects to Judge Atkins's denial of Howard's Requests 1, 2 and 3 for production of documents relating to other agents who, like Howard, may have been marketed FIP products by Schulze-Miller and other Shurwest employees. DE 98.

Federal Rule of Civil Procedure 72(a) provides that when a party timely objects to a Magistrate Judge's order on a pretrial matter, "[t]he district judge in the case must consider t[he] objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law." Judge Atkins denied Requests 1, 2, and 3, reasoning that "Howard never requested documents directly related to any of these individuals in any of her first, second or third requests for production of documents." DE 92 at 4. But Howard detailed the long and overlapping series of prior requests and demonstrated knowledge of several known responsive, but withheld, categories. Request 1 seeks documents relating to Alysha Myronuk, an agent/advisor who communicated with Shurwest employees about FIP and promoted FIP products to her clients. DE 86 at 3–4. Request 2 seeks documents relating to Gary Sickles, an agent/advisor in similar circumstances to Myronuk. *Id.* at 4. Request 3 seeks documents relating to "other agents across the country" in similar circumstances, including Chris Dixon, Edward Storer, and Jim Sweeney. *Id.* In support of her argument that she did, in fact, request documents related to the stated categories, Howard points to earlier, more encompassing general requests. For example, in her first set of requests for production of documents, Howard asked Shurwest to "[p]roduce all documents related to clients who worked with Shurwest and purchased a FIP Product." DE 98 at 3. Howard argues that this request, and similar ones, were targeted at the same documents she seeks in Requests 1, 2, and 3 of her Motion to Compel. Howard also points to her second request for production of documents, where she sought documentation relating to legal disputes involving Shurwest, in connection with FIP products. DE 98 at 4–5. The Court notes that two of the agents listed relative to Request 3 of Howard's Motion

to Compel, Chris Dixon and Edward Storer, appear as co-Defendants with Shurwest in multiple disputes cited by Howard. *Id.*

Judge Atkins's reasoning in denying Requests 1, 2, and 3 in Howard's Motion to Compel was clearly erroneous. Though Howard did not mention each agent by name in her production requests, she did make multiple requests that plainly blanket the documents sought in her Motion to Compel. A more generic ask envelopes a more specific one. It is inaccurate to fault Howard for not making a specific request, when the general request should have prompted production of responsive materials. The question remains, however, whether Shurwest should be compelled to comply with Requests 1, 2, and 3 in Howard's Motion to Compel.

In its response to Howard's Motion to Compel, Shurwest objected to Requests 1, 2, and 3 on the basis that Howard did not previously request those documents, and alternatively, that those documents are not relevant to this case. DE 89 at 4–6. As discussed above, though Howard did not name each of the identified agents in her original discovery requests, she did request, more generally, documentation relating to Shurwest clients who purchased FIP products. Considering Requests 1, 2, and 3 in the full case context, the Court finds them as clearly encompassing the targeted documents and fairly the subject of discovery requests in the case. Thus, the Court considers these categories of document to have been previously requested by Howard.

As to Shurwest's alternative relevancy argument about the documents sought in Requests 1, 2, and 3, Shurwest asserts that it was not involved in FIP activities, and thus any documents relating to its client's FIP activities are irrelevant. DE 89 at 4–6. Of course, whether Shurwest was involved in the FIP activities of several of its employees is the key

question at issue in this case. Further, despite Shurwest's argument to the contrary, the factual findings of another district court, in a case involving different parties and issues, do not create an incontrovertible record here. *Id.* at 5–6. Though the agents listed in Howard's Motion to Compel are not parties to this case, documentation relating to their interactions with Shurwest employees regarding FIP products may shed further light on the relationship between Shurwest, Howard, and FIP at issue here. This is particularly so given alleged representations (from Schultze-Miller to Howard) about Shurwest regularly using the FIP notes with other advisors. Thus, Requests 1, 2, and 3 are, indeed, relevant.

Further, as stated above, these requests are pared down or summary versions of previous requests. In her first set of requests, Howard sought "all documents related to clients who worked with Shurwest and purchased an FIP product." DE 86-2 at 3. Shurwest objected to the request, in part, because it was "vague and ambiguous." *Id.*[13] Taking Rule 1 into account, along with the full record, the Court sets aside Judge Atkins's denial and orders production of documents responsive to Request 1, 2, and 3. The Court thus Orders Shurwest to produce:

1. All documents related to FIP, FIP, Inc., Future Income Payments, LLC, Future Income Payment;

---

[13] Shurwest also stated, in response to this request, "[t]o the best of Shurwest's knowledge after a diligent investigation, Howard is the only Shurwest client who purchased an FIP product." DE 86-2 at 4. This characterization is a tough sell. Based on the record at this point, it seems that other Shurwest clients purchased FIP products and/or advised their own clients to purchase those products. *See, e.g.*, 86-4 (Myronuk emails) & DE 86-5 (Sickles Affidavit).

2. All documents related to Structured Cash Flow, Structured Cash Flows, Structured Cash, and SCF. However, the Court limits the production to such products connected in any way with FIP or related entities;

3. All documents related to agents/advisors with whom employees of Shurwest discussed or communicated about concerning the IRA Reboot strategy. This is at the center of the case, and Howard is entitled to know about others receiving the same type of pitch or information from Shurwest's employees.

The temporal scope for 1-3 shall be the period between January 1, 2016 and January 1, 2019. The discovery is relevant and proportional in this case.

Shurwest shall comply within 30 days of this decision.

**VIII.   Conclusion**

Accordingly, the Court **ORDERS** as follows:

1. The Court **GRANTS IN PART** Shurwest's Motion to Exclude the Testimony of Peter Kennedy (DE 99);

2. The Court **GRANTS** DE 93 and accepts DE 93-1 as timely filed;

3. The Court **GRANTS** DE 85 (insofar as it requests judicial notice of the fact of Melanie Schulze-Miller's indictment) and DE 88 (insofar as it requests judicial notice of the fact that Judge Bolton issued a summary judgment order in the District of Arizona matter);

4. The Court **SETS ASIDE** DE 92's denial of Requests 1, 2, and 3. The Court **ORDERS** production in response to Requests 1, 2, and 3, to the extent described above;

5. The Court **DENIES** Shurwest's Motion for Partial Summary Judgment (DE 55);

6.  The Court **DENIES**  Howard's Motion for Summary Judgment (DE 94);

7.  The Court **GRANTS** Shurwest's Motion for Summary Judgment (DE 100) **IN PART**, as to claims for constructive fraud, the Kentucky Consumer Protection Act, and negligent supervision; otherwise the Court **DENIES** DE 100;[14]

8.  The Court **GRANTS** DE 101, and DE 102 **SHALL** be maintained **UNDER SEAL**.

This the 19th day of March, 2021.

Signed By:

_**Robert E. Wier**_

**United States District Judge**

---

[14] As discussed above, Count 4, the generalized negligence claim, is subsumed by the negligent misrepresentation claim. Thus, three counterclaims remain active: Count 1 (Fraud), Count 3 (Negligent Misrepresentation), and Count 7 (Respondeat Superior/Vicarious Liability, which is really a theory of imputed liability, not a distinct claim).